WAGNER-TAYLOR-EDSON CO. INC. (NOW WAGNER-TAYLOR CO.), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7079.    Promulgated June 10, 1927.

The petitioner held to be not entitled to personal service classification for the year 1918.

*J. Robert Sherrod, Esq.,* and *Ward Loveless, Esq.,* for the petitioner.

*J. Arthur Adams, Esq.,* for the respondent.

This is a proceeding for the redetermination of a deficiency in income tax for the year 1918 in the amount of $14,493.70. The error alleged on the part of the Commissioner is that he failed to classify the petitioner as a personal service corporation for the year 1918.

### FINDINGS OF FACT.

1. The Wagner-Taylor-Edson Co. was incorporated January 7, 1918, and took over the business, as of January 1, 1918, of two companies engaged in the insurance business. One was a corporation which had theretofore conducted its business under the name of Wagner-Taylor Co. Such company was organized about 1907 and was the successor to a theretofore existing partnership which had been in business from about 1865. The insurance business conducted by both the partnership and the corporation had been profitable. The other business taken over had theretofore been conducted under the name of Edson & Co.

2. The current assets and liabilities of the two preexisting businesses were retained and liquidated by them and only the so-called " good will " of the two businesses was transferred to the petitioner upon its incorporation. The petitioner was organized with a paid-up capital stock of $25,000 par of 7 per cent cumulative preferred stock and $50,000 par of common stock divided into shares of $100 each. These shares of stock were issued to the stockholders of the two businesses which had been combined and were held during the year 1918 as follows:

| Stockholder | Number of shares | |
|---|---|---|
| | Preferred stock | Common stock |
| Louis M. Wagner | 85 | 125 |
| John C. Taylor | 85 | 125 |
| Harry A. Randall | 20 | 41⅔ |
| Robert P. Bishop | 10 | 41⅔ |
| Henry Edson | 37½ | 125 |
| Thomas S. Strobhar | 12½ | 41⅔ |
| | 250 | 500 |

3. Each and all of the above stockholders devoted all of their time to the active conduct of the petitioner's business. They had an understanding that no stockholder should engage in any other business, but each should devote his entire energies to the business of the petitioner, and this agreement was observed throughout the year 1918.

4. Salaries were paid to the stockholder officers for the year 1918 as follows:

| Name | Office | Salary |
|---|---|---|
| Louis M. Wagner | President | $15,000.00 |
| John C. Taylor | Vice president | 15,000.00 |
| Henry Edson | Treasurer | 9,000.00 |
| Harry A. Randall | Secretary | 4,000.00 |
| Robert P. Bishop | Assistant secretary | 3,000.00 |
| Thomas S. Strobhar | ----do---- | 3,000.00 |
| Total | | 49,000.00 |

Louis M. Wagner and John C. Taylor devoted all their time to the supervision of the business and to the soliciting of business. Harry A. Randall was in charge of the records of the corporation. Robert P. Bishop was in charge of the agency department and solicited business principally from other brokers. Henry Edson specialized as an expert on marine insurance, and Thomas S. Strobhar had charge of the engineering work, which consisted of estimating risks and in devising ways and means of lessening them and thereby lowering the premium rates. No persons were employed as solicitors of business.

5. No cash or other tangible property was paid in at incorporation. The capital stock was issued for the good will and agency contracts of Wagner-Taylor Co. and Edson & Co. Upon incorporation, Louis M. Wagner and John C. Taylor each loaned the corporation $5,000 as a working fund. These amounts were credited to their personal accounts. During the year the petitioner expended $12,500 for furniture and fixtures.

No money was borrowed from banks during the year with the exception of $35,000 borrowed on December 24, 1918. This amount was borrowed for a period of 30 days, and was for the purpose of enabling the petitioner to meet its commitments. Under date of December 18, 1918, the Board of Directors of the corporation passed a resolution directing the treasurer to call in $2,500 par value of preferred stock and to pay therefor $1,350 per share, or a total of $33,750. On the same date, the Board of Directors declared a dividend of 40 per cent on the common stock. They also directed the treasurer to distribute bonuses to the employees, other than stockholders, in the total amount of $4,292.75.

6. During the year 1918 the petitioner conducted a well systematized insurance office. It had in its employ at December 31, 1918, in addition to its 6 stockholders, 21 other employees. The business was divided into a number of departments, among which were the automobile department, the marine department, the fire agency department and the fire direct department. Its principal office was located in Philadelphia, but it had a branch office in New York City. One

of the stockholders also conducted an insurance office at Haddonfield, N. J., all of the business of which was turned over to the Philadelphia office.

7. The ordinary business of insurance agencies in Philadelphia and New York City is divided into two classes, brokerage and agency. A broker is one who obtains insurance business from assureds and places it through agents of insurance companies. An agent is a representative of the insurance company in a particular locality and his interest is in obtaining business both from the public and from other brokers. The petitioner was both a broker and an agent. It represented fourteen or fifteen different companies as agent in the city of Philadelphia. Its brokerage commission was at higher rates than its commission on the agency business. In any case where the business was obtained from another broker the broker got his commission and the petitioner received only what is called an overwriting commission.

8. In obtaining business from the public the petitioner advanced as an inducement the superiority of the services rendered by it in obtaining the necessary coverage. Such services consisted of (a) drafting the written-in portion of the policy so as not to run counter to the rules and exceptions of the insurance companies, (b) classifying the risks so as to obtain the lowest rates, (c) rendering engineering services in suggesting improvements or changes in the assured's property which would lower the risks and, therefore, lower the premiums, (d) obtaining prompt and fair settlement in case of loss, and (e) advising the insured when the insurance was about to expire.

9. Personal acquaintance and confidence in insurance brokers are important factors in getting and holding business. The broker is expected to work for the interest of the assured. If the service which is rendered by the insurance broker or agent is satisfactory, the business man will continue to insure through such broker or agent. Constant personal attention is necessary to retain business. The stockholders of the petitioner made it a point to fraternize with business men and constantly to maintain friendly relations with them. They made it a point to visit their clients frequently throughout the year. In this manner they were enabled not only to acquire new clients, but to retain their old clients. Advertising was not indulged in by the petitioner because it was found to be unprofitable.

10. In soliciting insurance business petitioner's representatives made no promises to extend credit to the assured or broker beyond the time allowed by insurance companies for the payment of premiums on insurance, nor did they encounter any competition from other agents or brokers where such competitors were offering credit beyond the period allowed by the insurance companies.

11. The assureds relied primarily on the individual stockholders of the petitioner corporation to take care of the business entrusted to the petitioner. They did not inquire as to, or specify which insurance company the business was to be placed with, and after the business was placed any communications in regard thereto were addressed to the individual who secured the business and not to the petitioner company. Much of the property insured by the petitioner during the year 1918 was outside of the City of Philadelphia. It is customary in Philadelphia for business men to have one insurance agent handle all his insurance business, whether or not the property or risk is located in Philadelphia.

12. When the petitioner received a large risk it was customary for it to place the risk among the several companies which it represented as agent. If the entire risk could not be placed with such companies the balance of the risk was placed with other brokers or agents. In the placing of such excess risks with other agents, it was customary to place the risk with agents who would also place excess risks with the petitioner.

13. During the year 1918 the petitioner had no income from Government contracts of any kind, or from trading in any commodity as a principal. Its business was solely the obtaining and placing of insurance and the net premiums on such insurance business amounted to $1,702,426.36, upon which the petitioner received commissions of $184,371.45, or an average commission of approximately 11 per cent of the premiums. Its only other income was interest in the amount of $572.37.

14. Of the $184,371.45 commissions on business written in the year 1918, $78,041.79 represented the petitioner's commissions on business placed by the assureds directly with petitioner, and $106,329.66 represented the petitioner's commissions upon business coming to it through other brokers. Upon such business commissions were allowed to other brokers in the following departments of the petitioner's business as follows:

| | |
|---|---:|
| Auto department | $25, 850. 74 |
| Fire department | 31, 001. 23 |
| Fire agency department | 123, 525. 39 |
| Marine department | 23, 890. 63 |
| New York office | 6, 790. 85 |
| Total | 211, 058. 84 |

15. The balance sheet submitted with petitioner's return for 1918 is as follows:

*Statement of assets and liabilities as of December 31, 1918.*

### ASSETS

| | | |
|---|---:|---:|
| Cash | | $13,037.98 |
| Trade accounts and notes receivable | | 265,495.74 |
| Investments: | | |
| Third Liberty loan 4¼ | 2,500.00 | |
| Fourth Liberty loan | 5,500.00 | |
| | | 8,000.00 |
| War Savings Stamps | | 709.61 |
| Loans and advances: | | |
| To others | | 4,857.08 |
| Deferred charges | | 449.68 |
| Fixed assets: | | |
| Office furniture | | 12,500.00 |
| Good will | | 75,000.00 |
| | | 380,050.09 |

### LIABILITIES

| | | |
|---|---:|---:|
| Notes payable to others | | 35,000.00 |
| Accounts payable: | | |
| Trade | | 207,250.42 |
| Others | | 7,302.55 |
| Accrued expenses: | | |
| Commission due subagents (estimated) | | 5,000.00 |
| Contingencies | | 3,667.76 |
| Capital stock outstanding | | 75,000.00 |
| Surplus | | 46,829.36 |
| | | 380,050.09 |

16. Whenever a policy of insurance was written by the petitioner, the books of account showed a charge to the assured of the total amount of premium and a credit to the insurance company of the amount of the premium payable to it after the deduction of petitioner's commission; the petitioner's commission was credited to a commission account. The petitioner had 60 days from the date of the writing of the policy within which to make remittance to the insurance company. The assured was charged with the commission as of the date of the policy and in a great majority of the cases the assured paid the amount of the premium before remittance had to be made by the petitioner to the insurance company. Remittances were made to the insurance company, however, without regard to whether the assured had paid the petitioner. The accounts receivable from brokers as of December 31, 1918, amounted to $122,672.54 and the accounts receivable from the assureds amounted to $140,329.26. The total accounts receivable on December 31, 1918, was $263,001.80, and the notes receivable on the same date were $2,493.94. The amount owed to insurance companies as of the close of the year was

$207,250.42. This amount was after the deduction of petitioner's commission.

17. From 80 per cent to 90 per cent of the premiums received by the petitioner during the year 1918 were premiums on renewal business. The petitioner kept careful watch of expirations of policies and within 30 days, or thereabouts, of the expiration of the policy the assured was advised of the expiration of his policy and the renewal of the policy was solicited by letter or a renewal policy was sent to the assured. This work was entrusted to clerks. If the assured refused to authorize the renewal of the policy and the policy was of any consequence one of the officers endeavored to obtain a renewal of it.

18. In its employ the petitioner had for a part of the year 1918 an expert who handled workmen's compensation insurance. It also had in its employ certain persons who acted as adjusters upon claims for loss under policies which it had written.

19. Petitioner filed a personal service corporation tax return for the year 1918. Personal service classification was denied by the Commissioner and tax liability was determined under section 328 of the Revenue Act of 1918.

### OPINION.

SMITH: Section 200 of the Revenue Act of 1918, so far as is material to the disposition of the case above, defines personal service corporation as follows:

The term "personal service corporation" means a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital (whether invested or borrowed) is not a material income-producing factor; * * *.

In claiming the benefit of an exception to the general method and extent of taxing corporations, the burden is upon the petitioner to show that it clearly comes within the term of such exception. *Hubbard-Ragsdale Co.* v. *Dean*, 15 Fed. (2d) 410. We are of the opinion that the petitioner has not satisfied the first requirement of a personal service corporation, namely, that its income is to be "ascribed primarily to the activities of the principal owners or stockholders." The petitioner was the successor of two insurance agency businesses which had done a profitable business. The capital stock of the petitioner was all issued for such good will. We are of opinion that much of the income of the petitioner was attributable to that good will. The major portion of the income of the petitioner

was from renewals of policies written prior to 1918. Witnesses for the petitioner testified that they seldom lost clients. It appears that the stockholders of the petitioner watched the renewal business, but the evidence does not show that the renewal business was ascribable primarily to their activities. Furthermore, it appears that the major portion of the income of the petitioner was from business which came to it through other brokers. More than one-half of its commissions came from that source. Of course, it was necessary that the stockholder officers of the petitioner be on friendly relations with those other brokers, but it does not appear that personal services were primarily responsible for this business. See *Appeals of Joseph Emsheimer Insurance Agency*, 1 B. T. A., 649; *W. J. Perry Corporation*, 1 B. T. A. 788; *Thos. J. Baker, Jr., & Co.*, 2 B. T. A. 13; *Harry S. Kaufman, Ltd.*, 2 B. T. A. 177; *Hurst, Anthony & Watkins*, 3 B. T. A. 53; *Houseal-Simons Agency, Inc.*, 3 B. T. A. 370; *Conklin-Zonne-Harrison Agency, Inc.*, 3 B. T. A. 544.

We are not satisfied by the evidence that capital was not a material income-producing factor in earning the income  For the year 1918 the petitioner had a net income, after the deduction of officers' salaries in the amount of $49,000, of $46,829.36. It was testified that the average commission earned by the petitioner upon its premium income for 1918 was approximately 11 per cent. If this held true with respect to the uncollected premiums at December 31, 1918, the commission upon those premiums was $29,204.53. This amount deducted from the total trade accounts receivable at the close of the year would leave $236,291.21 as the portion of the accounts receivable payable to the insurance companies in respect of those premiums. The amount owed to the insurance companies at the close of the year was, however, only $207,250.42, which would indicate that the petitioner was financing its clients to the extent of $29,040.79 at the close of the year. It is furthermore to be noted that although the petitioner had a large net income for the year 1918, nevertheless it found it necessary to borrow $35,000 at the close of 1918 in order to finance its commitments as of the close of the year. The cash on hand at December 31, 1918, was only $13,037.98. We are of the opinion that it has not been shown that capital was not a material income-producing factor for the year 1918.

*Judgment will be entered for the respondent.*

PHILLIPS and TRAMMELL concur in the result.